15-15-1 Shane Group Inc at all v. Blue Cross Blue Shield of Michigan A.D.A.C. Automotive at all, appellants, oral argument to be as follows, 15 minutes for the appellant, 15 minutes to be shared by the appellees. Mr. Walters for the defendant's appellants. Good morning. I would like to reserve two minutes for rebuttal if it pleases the court. May it please the court. This court has repeatedly noted that class action settlements are different than other settlements, that the district court cannot merely rely on the adversarial process to protect the interests of the persons involved in the litigation. The persons most directly affected by the litigation, namely the class. Rather, because class settlements seek to bind others, millions of others in this case, including my clients, which are 26 self-insured companies who hired Blue Cross as their third party administrator to administer their health care plans. Class action settlements are fundamentally different because the parties to the litigation gain special benefits that they would not otherwise receive in traditional litigation. The defendants gain the benefits of res judicata effect, barring claims for, in this case, millions of others who are not parties to the case who otherwise would have the right to bring claims. Plaintiffs' counsel gain the right to obtain attorney fees under the proposed settlement that might not otherwise be available to plaintiffs' counsel. And plaintiffs themselves, in this case, under the proposed settlement, would receive incentive awards that they would not otherwise receive in the litigation. As a result, courts have established three different procedural safeguards on class action settlements, all three of which have broken down in this case. The first procedural safeguard is that the proponents of the settlement have an affirmative burden to demonstrate the fairness of the proposed settlement, unlike in a traditional case where the fairness of the settlement is essentially presumed based on the adversarial process. Second, the district court is to hold a fairness hearing to allow objectors to the proposed settlement the opportunity to be meaningfully heard by the court. Third, the district court must independently carefully scrutinize the fairness of the settlement and cannot simply defer to counsel for the parties. This court has noted numerous times that the district court cannot do so without weighing, without evaluating the plaintiff's particular likelihood of success on the merits against the amount in form of relief that would be received under the settlement. There have been breakdowns in this case on all three of those procedural safeguards. First, the record fails to demonstrate that the proponents have met their burden of proving that the settlement is fair. If you look at Dockett Entry 148, the plaintiff's unopposed motion for preliminary approval of the proposed settlement, in that document there is not a single reference to a single substantive document in the case, any testimony in the case, anything that would inform the plaintiff's decision. Now, there was a fairness hearing. There was a fairness hearing, your Honor. So at that hearing, the court heard testimony on all kinds of things, right? The court did not hear any substantive testimony at all at that fairness hearing. There was an opportunity for counsel to argue. How long had the court had the matter before it? Three years? The case was initially filed in 2010. The motions to dismiss were ruled on and denied in 2012. So how many years? It was three years, wasn't it? Yeah, it's actually closer to four years by the time the case was initially filed to the time of the... So this was, yeah. My point, of course, is the court had a good bit of familiarity with this case. Without a doubt. Without a doubt. There was motion practice before the court. There was discovery disputes that were presented before the court. So without a doubt, there was at least some level of familiarity that the district court had with the case. Absolutely, your Honor. Does that matter? It does matter to... You're painting the picture as if it's a clean slate here. And there needed to be all this substance that wasn't offered. I'm just wondering if you would acknowledge that there was a lot of knowledge by the court and all the parties by the time we're getting to the settlement. I guess it's difficult for me, as the objector, not being able to have seen so many of the substantive documents that were submitted to the court because the motion for class certification and all the exhibits were filed under seal. The opposition and all the exhibits were filed under seal. The opposition to your motion was largely redacted, I guess. Yes. You haven't seen that to your own motion. And so it's extremely difficult for me to comment, your Honor, on the extent of knowledge that the district court had about the substance of the case because we're left here almost completely guessing. You came in late. Quite late. You and your clients came in quite late to the game here. We came in once we received notice that there was going to be a proposed settlement that was going to affect our rights. Absolutely, your Honor. And we did so in a very timely fashion once we learned of the proposed settlement. But you didn't know about the case being filed or any of this? I thought you had ongoing litigation of your own. My clients have ongoing litigation, had, and in some cases still have ongoing litigation against Blue Cross related to hidden access fee issues. In fact, one of those cases came before the Sixth Circuit, the Hylex decision, on behalf of one of our other clients. Those cases don't have anything to do with the antitrust issues, the most favored nation, if you will, agreements that Blue Cross entered into with over half of the hospitals in the state of Michigan. So there was, of course, prior context for our clients being in an adversarial relationship with Blue Cross. Frankly, that's how my firm got involved in the case is we had clients who had litigation with Blue Cross separate from this, received a postcard giving them notice that there might be a settlement in a completely different action, contact us and say, well, what do we do with this? And that's what is happening in August and September of 2014, leading up to the time that we file our objection and then immediately follow up. We've tried to work with counsel for the proponents of the settlement to see if we could work out an arrangement to get access to the records to do something voluntarily. We worked on that for two or three weeks. What we got back was redacted to the point of being not meaningful. And at that point in time we found out. Am I correct in understanding that factually in that process it's the parties that are making decisions about what to redact and the district court is not exercising authority over that? That's certainly what we see, Your Honor, that there was kind of a blanket protective order that was entered. In the DOJ case. That gave the parties the ability to submit materials under seal, but then the parties were making the decisions on a document-by-document basis as to what to submit under seal. I did not see any evidence in the record that the district court or a magistrate judge, for example, on reference, was actually going through and playing any sort of oversight role in looking at what was being filed under seal and trying to make any sort of specific findings that, you know, this document should be under seal, this shouldn't be under seal. And, in fact, it clearly wasn't happening because there were not, as you would often see in cases in my experience, there might be a sealed version and then a redacted version available for the public that had most of the document available but had only certain specific sensitive things maybe redacted and kept under seal. That didn't happen in this case. What was lacking the most in the fairness hearing is the fact that, did you ask the court to hear from live witnesses or consider depositions or what was your position there? What was lacking the most is that we had filed a motion to intervene for the limited purposes of getting access to the record so that we could assess substantively whether this was a fair settlement or not, whether or not the claims had merit, whether or not the damages that were being presented were reasonable or appropriate. And we were really, in the fairness hearing, I would say we were arguing with both hands behind our back, not even just one hand behind our back, in terms of not having any access to the substantive basis for the settlement. This court has repeatedly held that the district court, in doing its role, has to look at the plaintiff's likelihood of success on the merits on the case and weigh that against the amount of relief being afforded. We were unable to present meaningful argument to the district court as to the plaintiff's likelihood of success because we had absolutely no access to any of the documentary evidence or testimonial evidence that would be probative as to whether or not these MFN agreements were in fact anti-competitive, driving up costs for hospitals in Michigan and harming class members. Absolutely none of that was available to us. And so that was the biggest problem we had with the fairness hearing process, Your Honor. Thank you. Going back to the first point, that the record itself, that the proponents of the settlement did not present any evidence in their motion for approval of the settlement as to the likelihood of success on the merits. Rather, the approach was to look at the damages report that was submitted by the plaintiffs and to say, well, 25% of that is a reasonable amount because in all kinds of other antitrust cases, not the case before the court, all kinds of other antitrust cases have settled for less than 25% of the recovery. I would suggest that that is insufficient, that comparing it to different cases on different facts from different jurisdictions is insufficient, is not particularly probative of the likelihood of success of the merits that the plaintiffs had in the case that was before the court. And the district court, unfortunately, fell into that same error, adopted that reasoning in her opinion and relied very heavily, very heavily on the opinions of class counsel that the agreement was fair in reason. Essentially, the district court treated this as a traditional settlement and simply deferred to the opinion of counsel. I don't know what reasoning you're talking about in terms of the district court adopting as to likelihood of success because I just don't see much. She says there was discovery. Okay, I mean, that doesn't say much about the merits either way, and that, by the way, is another factor in the UAW test. It's not this factor. And then, you know, there's a generic statement about risks of litigation. Is there something else you're referring to in terms of specific reasoning about the likelihood of success? I would say I don't think there is. Other than deferring to counsel. Yeah, I don't think there is, Your Honor, other than I believe that the district court did, in its opinion, cite the cases that were presented about other antitrust cases and what they had settled for in other jurisdictions. And so there are those general statements. You know, antitrust cases are tough to win. There's lots of challenges. We all understand that, people who have litigated in that area. But there's nothing that's specific to the facts that were before the court in this case. One thing I wanted to ask you is, I mean, you argue this $850 million number in your brief, but at the time the plaintiff's expert comes up with his number, which I think was $118 million. That's correct. I mean, that's before, so far as the record shows, that's before any settlement negotiations. And so at that point, plaintiff's counsel has every incentive to maximize that number. And so, I mean, that number doesn't seem to be subject to some of the concerns that the case law describes on the one hand. And on the other hand, the $850 just doesn't seem to have much basis other than sort of some very rough mathematics. And I appreciate that, Your Honor, and that's essentially all that we work with. I know you don't have any merits information to look at. Yeah, and it's so difficult for me to comment even on the expert report because any of the papers related to the motion practice is entirely under seal. You haven't been given that at all, I guess, right? That's correct. So my time is at red. Okay. Thank you. Good morning. May it please the Court. Let me start by reminding the Court about some basic history of this litigation. As Your Honor noted at the outset, this case was filed four years before there was a settlement. Plaintiff's counsel reviewed millions of pages of documents in discovery. Participated in 169 depositions. Paid their expert $2.5 million to work with terabytes of data to form complex regression analyses in an effort to estimate damages. And you're right, Your Honor, at the time that that work was done, we were in intense litigation here at Blue Cross with every incentive in the world to maximize the damages. And we tried very hard to do that, spending a lot of money. During the adversarial stage of the litigation, I mean, the concern and let me just make clear up front, it is not specific to any of the lawyers in this case. Okay. It's about incentives, you know. I mean, a judge can't sit on a case in which he has an interest because there are bad incentives involved for the judge personally. It's not an imputation about the judge's integrity. The incentives are just bad. And the case law in DRIMACS discusses how the incentives change in the settlement process. And so unquestionably, and you look at this record, I mean, it's different than DRIMACS. It's different in important ways, and I totally recognize that. But once you get into the settlement negotiations, the incentives are different. And so the district court has to be really careful. And so even though there is the four years of adversarial litigation, what we're looking at is the settlement agreement. And so we have to look at that agreement and specifically the process that leads to it. Yes, Your Honor, I agree with that. But the adversarial nature of the litigation does not end when settlement negotiations begin. Sure. It would be an understatement to say it does. Right, because our incentives in settlement negotiations as well as in litigation is to maximize the recovery. It's what we need to do for our clients. It's what we need to do in our own interests because our recovery as lawyers is tied directly to the ability to Right, and that makes all the sense in the world. I mean, the concern is a little more subtle. And again, it's not about you, Mr. Small. Thank you. It is that, and the case law has written about this, the First Circuit has written about this, that there could be a temptation, there could be an incentive to take a somewhat lower overall number from the defendant in favor of what, just as one example, the First Circuit called red carpet treatment on fees. You know, rather than take 40 or 35, we'll take 30, but we get a clear sailing provision, which we have in this case. That's the concern. And I mean, I'll just be candid with you. My concern in this case is that the core concern is that in evaluating the fairness, the most important factor is the plaintiff's likelihood of success. And there is simply no analysis, none, of that specifically in this opinion. We have five parts recitation, one part platitude, and that's it, unless I'm missing something. Well, that's a fair question, Your Honor. Let me go through what was before the district court when that decision was entered, approving the settlement. Number one, there was an extremely full record. Class certification motion, expert reports by the plaintiffs, expert reports by Blue Cross, Dawbert motion by Blue Cross, responded to by the plaintiffs, challenging the work of our expert, declaration from plaintiff's counsel on the nature of the settlement negotiations, a contested leadership motion for appointment of lead counsel. So the court specifically weighed in on the adequacy of counsel to represent the class in this case. A parallel government action raising the same issues, vigorously litigated by the Justice Department. Parallel action by Aetna, a competitor of Blue Cross, vigorously litigating this issue. Reams of discovery. So the record really could not have been fuller, particularly on the issue of whether $118 million is a reasonable estimate of damages that the court did not abuse its discretion in relying upon. I guess in a sense, you know, class actions really are different, and normally sort of the party's conduct defines the scope of what we look at. But here it's the unnamed class members, millions of people and organizations in Michigan that are affected by this. And so what you just described shows that you all did your job. You know, you really did. I mean, this wasn't just, you know, all right after a motion to dismiss in the case. And you are to be commended for the work and your reputations precede you that went into this. Don't get me wrong. But the district court didn't. At least when I read this, there's no analysis here. I mean, platitudes are not analysis. Litigation has risks. I mean, what does that tell us about the merits of this claim and why it made sense to give away? Take the 118 number. I don't know why we don't triple it because that's what you must get at trial if you win. You must. But just take the 118. You're giving away 75% of that. 87% if you look at what actually goes to the unnamed class members. And the district court doesn't answer the question. Why does that make sense? Well, in the UAW case that this court decided, the court focused on what was presented to the district court by the parties as a foundation for whether the settlement should be approved. So I don't think it's the approach that courts have taken in reviewing class action settlements, trying to get inside the district judge's head to see what was actually going on there. We do have sort of a principle around here that a district court has to provide us with a document that allows us to review its work. I mean, we have sentencing cases all the time where a district court, in computing drug quantity, doesn't explain how it gets the number. And the number might be right, and the parties might have put everything in front of the court. But the court, in that instance, has to do it again. I mean, look at like Joiner. I mean, everybody here knows the Daubert cases because it's been litigated. Joiner says you can have the best expert with all this great data, but if there's an analytical gap between the data and the opinion, it's no good. And I guess that's what I'm concerned about here. The unnamed class members are giving up an awful lot. And why isn't there an analytical gap, not an evidentiary gap necessarily, but an analytical gap between the evidence here and the district court's approval? Well, Your Honor, there are things that the district court relied upon and did articulate in its decision that I think is highly relevant that doesn't require a detailed analysis of the evidence. And this court has held, of course, that the district court has wide discretion as to what evidence it considers in support of its ruling. So, for instance, the district court had four years to observe the work of counsel in the case and specifically noted that as a reason to rely on the opinion of counsel in this case. The district court saw the expert report for the Daubert motion, presumably.  Presumably. I mean, I don't know. Maybe the district court forgot some things. It's just not here. It's literally one paragraph. I mean, the other side of it... Seven million people in Michigan potentially are affected by this. I mean, can't we expect a district court to give us more than one paragraph? You know, five sentences, two of which are irrelevant, and one's a platitude. I mean, is that too much to ask? I'm not saying this is facially unfair. I'm not saying that at all. But I'm saying before we adjudicate the rights of millions of people in Michigan on a serious claim, it's every couple of years we get one of these anti-competitive cases about Blue Cross. This is a serious claim. And isn't it fair to ask the district court to do more than what I just described? The district court, Your Honor, also made a finding about plaintiff's expert, specifically found that the expert was highly qualified to perform this work. And that's obviously a key piece of this is whether the estimate of damages that our expert came up with was reliable or at least sufficiently reliable that it could be a basis of a proven statement. Why not stay closer to 120, then, rather than give 75 percent away? You know? Especially when you're going to get 360 at trial. It's going to be troubled. At least why not explain? Explain something about why. And don't worry about that light. Explain. That's all I'm saying. Give us an explanation. And I think, you know, on the amount recovered, the court did cite to case law that says, in cases just like this, I know every case is different, but this is not on the fringes of the range of recovery that has been approved by several courts over the years. This is right in the center of it, maybe even on the high end of the recovery of damages. And, you know, the court was aware, too, Your Honor, of what this case was about. It's a rule of reason case involving MFN provisions, which are not commonly litigated. Very challenging. Hard causation issues. Hard to prove damages. Not obviously anti-competitive in that they ensured the lower price for consumers. Well, I'll let Blue Cross address that, but obviously Blue Cross makes a big point in their briefs that the theory of this case is not that it's a most favored nation clause, but that it's a most disfavored nation clause. And, I mean, literally the only analysis I see of the merits in this case are about three pages in Blue Cross's brief where they analogize this to predatory pricing, and I guess that's for them. But here it's not lowering prices. According to plaintiff's theory, it's raising them. If you give us a most favored nation, we'll give you higher rates in return, as long as you charge everybody else those rates. It's the opposite of predatory pricing. It's a lower price. But that said, who knows? Because, you know, the district court that had this case for four years didn't explain any of this. You know, we're not here, Your Honor, to undermine our views of the merits of the liability case. What we are saying is our best effort after millions of dollars investing in expert analysis and years of work was to prove $118 million. That's our point. And to get $30 million of that in a difficult case, we believe is a very good outcome for the class. If I can just ask you a couple of questions on other things. Who is better to talk to among you and Mr. Trela about ceiling issues? I'm happy to address them, Your Honor. Okay. This case is really unusual in that respect. Okay, again, you know, this is a case that affects the rights of millions of people in Michigan, as plaintiffs have pointed out repeatedly in the litigation. There is a very strong default in the federal courts that we, our business, is in public. And the Supreme Court has said, our court has said, that before the district court can seal documents, it basically has to satisfy a strict scrutiny standard, that there must be compelling reasons to seal the documents and the ceiling has to be narrowly tailored. The Supreme Court has said that. And that obligation is incumbent on the district court. It doesn't matter whether somebody objects. It doesn't matter. It's like when we get a sealing motion here, maybe a criminal defendant wants to seal something and the United States doesn't object, that doesn't mean we grant it. We take a close look because our business is in public. And this is just extraordinary that the basis of a settlement affecting the rights of millions of people in Michigan is unknowable for them. Did the district court do a specific, on-the-record finding, as required by the precedent, as to particular documents here, the expert report, the motions, et cetera, and make a finding that there are compelling reasons, here are what they are, and this is why this is the most narrow approach we can take. Did the court do that? I mean, it's a huge record. The court never got there, Your Honor, because there was a procedural default on the part of the objectors. But my point is, it doesn't matter if they show up or not. You cannot close the docket. It's not about discovery. You cannot close the docket of a federal case as a district judge unless you satisfy the standard. The Ninth Circuit just yesterday had an opinion in a class action that said, open it up, open it up, the class gets to see what's in here. Well, first of all, Your Honor, protecting sensitive commercial information, and in this case, sensitive personal medical information that may be protected by HIPAA. Right. Nobody wants that. Right. That could be determined by just saying patient X or patient Y or something like that, couldn't it? Yeah, I mean, there are ways to protect it, but it's a very, I would say, routine practice in commercial cases like this one for the district court to enter a protective order. That happens all the time in the parties. Well, maybe we should give your co-counsel, so to speak, today a chance. Can I say one thing in response to your question? Sure. Yeah, I don't want to get in trouble with the presiding judge. All right. I'll make this very quick. The important point, Your Honor, is this is not just a First Amendment type argument that the objectors are making, that they want to have access to sealed records. That's not what it's about, certainly, for the plaintiffs. At one level, it's not our confidential information in Dr. Leitzinger's report. I'd be happy with them to have it. It's what they want to do with it that makes this different. They want to use it to have more settlement approval proceedings. They want to be able to come in with their own expert, review the report, submit it. And your argument against that is the tardiness, I take it. The procedural default. In the Sixth Circuit decision in UAW, there was a standard before an objector is entitled to get discovery and to multiply. But it's not discovery. They just want to see stuff that's already there. And, as you said, they want to see it to be able to evaluate the merits of the settlement. They could hardly do that four years ago. And there was a fairly tight time window to sort of object and everything. But I understand your point. We'll hear from Blue Cross. Thank you. Thank you, Your Honor. May it please the Court. Let me turn to the sealing issue first, and I'll give the Court a little bit of background. This all originated with the Department of Justice case. The DOJ insisted on a very strict protective order. And what the District Court did was recognize that the normal process would be to file sealed and then redacted versions in the public record. The Court directed the parties not to do that just because of the immense burden because of all this third-party confidential information. So, pursuant to the protective order, which is Docket Entry 47, these documents were filed completely under seal. But the order expressly provided a procedure for any member of the public who wanted to challenge any of the designations to come in. And then the burden would be on the proponent of sealing to justify that, just as Your Honor indicated it should be the case. So what we have here, then, is three weeks before the fairness hearing, the objectors show up and they want to unseal all of this stuff. Most of which, not only isn't the plaintiff's information, most of it isn't ours either. It's third-party information. This is about two weeks or two months, 60 days after the Court signals it's going to approve the settlement? Is that right? Well, there was preliminary approval in June. The objection and opt-out date was the end of September. And this was late October that they filed their motion. And the fairness hearing is November 12th. Okay. I mean, people have other things to do than sort of track every class action. I mean, it's not so terribly untimely to, you know, two-thirds of the way through the process say, well, wait a minute. We actually need to see some of this. Well, interestingly, though, they were able to file a detailed objection by the deadline without seeing anything. So, you know, I question how much they actually needed to see in order to file their objection and participate. How can they do this without seeing the expert report, which is the basis for the sort of starting point? Well, let me address that, Your Honor. Now, the public filings made clear or at least summarized the key evidence, and in particular two pieces of key evidence. That is that the plaintiff's expert and the public filings described the analysis he did and his conclusion, that he could only show measurable damages at some hospitals and a total of $118 million. The filings also indicated that representatives of all of the major hospitals had testified without contradiction that the MFN agreements had no impact on their pricing decisions. Now, the underlying testimony was sealed, the expert report was sealed, but the basis for the plaintiff's decision to settle was in the public record. But the expert report was not shown to Mr. Walter's clients at all? I'm sorry, would you say that again, Your Honor? The expert report was not shown to Mr. Walter's clients at all or to him? It was not shown to Mr. Walter's clients or to him, that's correct, Your Honor. It was denied? It was denied as untimely by the district court, correct. Just on untimeliness? Correct, Your Honor. And that's before the hearing? I mean, it's not that hard to just hand over the report. Well, it is harder than it might seem, Your Honor, because the report was based on extensive third-party information. I mean, I've seen the report. Right. There's no patient information. No, there's no patient information. I don't know if there's anything specific to particular hospitals in there. I mean, it's at a high altitude. It didn't jump out at me that, you know, okay, well, this is like a state secret or something. Well, the fact is that I don't think the district court could have just, consistent with the protective order and consistent with the understanding of the third parties when they produced the information, couldn't just unseal it. I think the court would have had to give notice to the third parties and give them a chance to come in and explain why information should or should not remain under seal. And, again, we're talking about three weeks before the fairness hearing and, you know, four or more months after notice went out on this. So you're really talking about disrupting the fairness hearing that the parties had been building toward. And I think, Your Honor, disrupting it a lot because what would have happened would have been basically an attempt to second-guess the plaintiff's case. I mean, this was the plaintiff's. That's kind of what they're trying to do. Well, it is what they're trying to do. As a district judge, I would welcome some adversarial process in trying to make a hard decision about likelihood of success. Well, Your Honor, we don't think it was a hard decision. These kinds of claims, if you look at the Supreme Court's decision in Weyerhaeuser, that's exactly this kind of a case, the notion that a defendant tried to jack up the costs to hurt its competitors. And the Supreme Court has said that you have to do a predatory pricing-type analysis. And there was no evidence of any of that. But, again, here the theory is I understand it, and the Department of Justice took it seriously enough. The Antitrust Division, they know what they're doing to bring a case. The theory is it's not like predatory pricing because it's a Most Favored Nation Clause given in exchange for Blue Cross's agreement to let the hospitals charge Blue Cross more. Right. And then that means everybody has to pay more because of the MFN Clause. That's not predatory pricing. I disagree with you, Your Honor. If you look at the Weyerhaeuser case, the court there says that's basically the flip side of a predatory pricing case because the defendant, you're assuming the defendant is acting irrationally by jacking up its own costs, voluntarily reducing its own profits, which, as the court held, as in a predatory pricing case, you have to show two things. You have to show that the defendant was actually operating at a loss because of that and that there was a dangerous likelihood that it would earn super competitive prices in the future to recoup that loss. I mean, there are arguments on both sides. The problem is that we just don't have any explanation of why it made sense for the class members to give up 75 percent, 87 percent, depending on how you calculate it, of the value that their very sophisticated expert put on the case. Well, Your Honor. There's not even any acknowledgment of what they're giving up. There's not even an acknowledgment of what the unnamed class members are giving up. Well, Your Honor, and I see I'm out of time, so I'll try to be at the risk of aggravating Judge Cook. I'll get right to the point. The district court certainly could have said more, but the court wasn't intimately familiar with this litigation, not only this case but the Aetna. It didn't say anything. Well, in the court's defense, at page ID 6991 to 6992, she notes that MFN-type cases in the health care industry are difficult and basically unprecedented. And then at 6993 to 6995, where she has, I think, the analysis Your Honor was referring to earlier, I think the bottom line of that analysis is she's saying, even accepting that the plaintiffs have a high likelihood of success, given the complexity of the litigation, the time until resolution, 25 percent is a good recovery. And so, therefore, this settlement is fair and adequate. It's just not stated in those terms. It's reciting one side's argument, the other side's argument, and then, you know, here it is. Extensive discovery has been held. The court denied your motion. Okay, sounds like a good case so far. In light of their analysis of damages, the settlement amount reached is fair. I mean, okay, but the number, the expert said 120. So why is, you know, and just really quickly, I mean, we have less than a 1 percent take rate in the class, as I understand it, 26,000 people out of the millions and millions. So less than 1 percent signs up for this. Isn't that an indication that maybe this isn't such a great deal for the class members? Two quick comments in response to that, Your Honor. The number is actually up to 43,000. At the time of the fairness hearing, it was 27. That's about 1.5 percent. And it's actually not surprising when you consider what the plaintiff's case ultimately became, which is that they could only show anticompetitive price increases at 13 hospitals under a limited number of provider agreements. So, in fact, under their own theory, I'm pointing the wrong way, under their own theory, only a very small part of the class would have had any measurable impact anyway. And so, no, it's not surprising that you have a fairly low take rate because most of the class would have had minimal impact from this supposed conspiracy. Okay. Thank you. I think we're going to leave it at that, thinking about fairness. Thank you. Thank you both for your answers. Thank you. I'm almost tempted to wave rebuttal because you've gone well over the limit, but I do want to talk very briefly about the timing of our motion to intervene and make sure that the court understands how that all played out. We were contacted by our clients, and it wasn't all at once because we were contacted by multiple clients, starting in essentially mid-August of 2014. And we, in fact, myself personally, led the investigation. I didn't know anything about a MFN case going on against Blue Cross whatsoever, so trying to do some research and understand what's happening here to be able to advise the clients with a mid-September deadline to opt out, object, file a claim. The claim filing deadline was in November, but we had to figure out in very short order what to do. The focus of our work until mid-September was let's try to understand what we can based on the information that's available, and we made the decision to put together an objection. Immediately after we put together an objection, I reached out to counsel to try to get access to the records. Part of our problem here, a big part of our problem, is that we don't have access to these records. We were prepared to file a motion to intervene. We do what we're required to do under the local rules, seek concurrence on the motion, try to figure if we can work it out. We go through a process of trying to work it out. They say, oh, we think we can work this out. We can redact out the real sensitive stuff and otherwise give you the information you need. I go through that process with counsel for plaintiffs and counsel for Blue Cross for about 3 weeks, and I get back pages and pages of black ink with nothing substantive. That's the information that was attached to our old records. What substantive information did you expect to get? I expected to get documents. I mean, we don't know what was redacted, nor do you, but what did you expect to be told? I expected to see testimony from the Blue Cross people who came up with the MFN ideas about what the goals were and what they were doing. I expected to see numbers about what happened to hospital rates before and after the MFN agreements went into effect. So all the work that was done by the plaintiffs and defense counsel. Well, not all the work, but certainly the work that was being relied upon. But you did file objections, and they were detailed. As detailed as we could make them. And a big part of the objection was we don't know. I mean, that was probably the number one objection that we had. We were able to point to what we knew about the public record, about the DOJ's investigation. But really, the interesting thing about your objection, and I have a question about that, is that your objections were tailored to the inflated number that was not borne out by any expert. The 850, or the billions. What we could do is based on the allegation in the complaint. There's an allegation in the complaint that these MFN agreements actually caused prices to increase by 16 percent on average. It's paragraph 5 of the consolidated amended complaint. So based on that allegation, what we said, if that's actually true, because we have no evidence to evaluate whether that's true, but if that's actually true, this is a multi-billion dollar case. Once you came to know, at some point, your group came to know that the expert had evaluated the case significantly lower than anybody expected. We knew that at the time we filed our objection. That's what I'm saying. Okay. Did you rework your objection then? No, because we didn't have access to the expert report. So you thought maybe we could start over and challenge and get a different report, get a different estimate of how damaging this was to consumers? Frankly, Your Honor, I don't know if that would happen or could happen or not, because we haven't seen what's there. I mean, it is entirely possible that my clients, if and when we actually have access to the substantive information that would weigh on this, might look at it and say, that is a pretty good settlement. I have no idea. I have no way of knowing. I have no way of advising my clients one way or the other. And that's the conundrum that we're in. That's the catch-22 that we've been placed in, unfortunately. Remind me what your request of relief is today. We ask that the district court's opinion be reversed and that the case be remanded to the district court for further proceedings, that we have essentially a new fairness hearing, and that in preparation for that fairness hearing, that my clients have the opportunity to inspect the record, that whether that is through the record being unsealed, whether it's through in-camera review, whether it's through the assistance of a magistrate judge in the process, that our motion to intervene to unseal the record or otherwise be able to access the record be granted so that we can meaningfully participate. Of course you heard, counsel, that the sealing of the record is a function of the original case by the government, and there's all kinds of protections that prevent you from looking at the bare unsealed record, right? Individual's personal data, their medical records and their... I think the problem, and I think Judge Ketledge put his finger on it, is the fact that it was just sealed in total, that there wasn't any tailoring effort that went into that in terms of what's being filed under seal and what's not. I mean, to simply file the class certification motion and all 90 exhibits under seal in its entirety is obviously not reasonable and not specifically or narrowly tailored. Have you even been given the details of the MFN scheme at issue here? No. Okay. Thank you. Thank you, counsel, for both sides. Interesting case. We'll take it under advisement and issue an opinion in due course. Thank you.